**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JAMES PICARD,

      Plaintiff/Counter-
      Defendant,                     Case Number: 04-CV-71008-DT

v.                                     HON. PAUL D. BORMAN

BEST SOURCE CREDIT UNION,

      Defendant/Counter-Plaintiff,

and

HUDSON'S & FIELD'S EMPLOYEES
CREDIT UNION DEFERRED
COMPENSATION PLAN

      Defendant.

_____/

**OPINION AND ORDER:
1) GRANTING DEFENDANTS' JOINT MOTION
TO AFFIRM THE PLAN ADMINISTRATOR'S DENIAL OF BENEFITS, TO WHICH
COUNT II OF PLAINTIFF'S COMPLAINT PERTAINS; AND
2) GRANTING DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON
COUNTS I, III, AND IV OF PLAINTIFF'S COMPLAINT**

Now before the Court are the following two motions: 1) Defendants' Joint Motion for

Judgment Affirming Plan Administrator's Decision to Deny Plaintiff's Claim for Benefits

("motion to affirm"); and 2) Defendants' Joint Motion for Summary Judgment.

The Court heard oral argument on August 3, 2005. Having considered the entire record,

and for the reasons that follow, the Court:

    1)      GRANTS Defendants' joint motion to affirm the Plan administrator's decision to
             deny Plaintiff benefits, to which Count II of Plaintiff's complaint pertains; and

2)      GRANTS Defendants' motion for summary judgment on Counts I, III, and IV of Plaintiff's complaint.

## I.  FACTS

In October of 1983, James Picard ("Plaintiff") commenced his employment with BestSource Credit Union ("BestSource"), then known as Hudson's and Field's Employees Credit Union ("HFECU").  Plaintiff ultimately became BestSource's President and Chief Executive Officer.

Plaintiff became a participant of the HFECU Deferred Compensation Plan ("the Plan") on June 1, 1995, the Plan's effective date.  (Plan at § 1.05.)  According to its Preamble, the Plan was designed to enable a select group of management employees whom the Plan covered to enhance their retirement by providing deferred compensation to be received at normal retirement age (age 62), disability, or death.  (*Id.* at § 1.05, 1.08; Preamble) From June 1, 1995, through the end of Plaintiff's employment,  Plaintiff was the Plan's only participant.  (Compl. at ¶ 16.)

The Plan required BestSource, on Plaintiff's behalf and for Plaintiff's benefit, to contribute $20,000 per year in deferred compensation to a trust so that BestSource, as trustee, could "administer, invest, and re-invest" that contribution.  (Plan at §§ 1.04, 3.01-02, and 7.02; Schedule A to Plan)  For the benefits to vest, Plaintiff had to remain employed until age 62, "except in the event of prior death, [t]otal [d]isability (as defined herein) or termination without cause."  (Plan at § 1.12.)  In addition, even if the benefits vested, they could be forfeited if Plaintiff was "discharged from employment . . . for cause," or if Plaintiff "perform[ed] acts of wilful malfeasance or gross negligence in a matter of material importance to the Employer."  (*Id.* at § 5.4(a)-(b).)  Otherwise, as noted above, the Plan benefits were payable only upon Plaintiff's retirement, his prior death, total disability, or "separation from service without cause."  (*Id.* at §

2

4.01.)  The benefits could be paid in either a lump-sum payment, installment payments, or in the form of an annuity.  (*Id.* at § 5.02.)

In addition to being Plaintiff's employer and the Plan sponsor, BestSource, which consists of its Board of Directors ("the Board"), was also the Plan administrator and the trustee of the Plan assets.  (Defs.' Ex. 1; Plan at §§ 3.01-02, 4.01-02, 5.01-02, 7.01-02.)  The Plan administrator had full responsibility to operate and to administer the Plan and to direct payments of benefits.  (*Id.*)  The Plan administrator also had the full discretionary authority to interpret the terms of the Plan and to determine all questions arising in connection with its administration, interpretation, or application.  (*Id.*)

Plaintiff's employment ended on April 5, 2002.  The parties dispute the circumstances leading up to the termination.  According to Defendants, Plaintiff was terminated for approving, between November of 1999 and February of 2002, approximately 28 loans totaling over $3 million to Dwight Scott ("Scott"), one of BestSource's members, in violation of certain policies, laws, and regulations governing BestSource ("the Scott loans").  (S.J. Br. at 1, 3; Affirm Br. at 12.)  BestSource maintains that an internal audit for the year 2001 that an outside accounting firm–Doeren Mayhew–conducted in 2002 revealed that Plaintiff had improperly authorized such loans.  (S.J. Br. at 4; Affirm Br. at 11.)  Specifically, Robin Hoag ("Hoag"), an accountant of the firm, advised BestSource of the following concerns about the Scott loans: 1) the loans' underwriting and approval amounts exceeded loan policy; 2) a Scott-hired appraiser valued the real-estate loans, not an independent appraiser; 3) the Scott loans' files did not clearly document BestSource as the first lien holder; 4) because many of the Scott loans were for non-owner-occupied rental homes, they were member business loans and, thus, violated National Credit

Union Administration ("NCUA") Rule and Regulation Part 723 for the minimum loan to value, and exceeded 15% of BestSource's net-worth limit; 5) the Scott loans, as loans to one member and loan-to-values, violated Article XII of BestSource's by-laws; and 6) the Scott loans had low rates compared to the credit risk and loan-to-value ratios.  (SJ Ex. E and F; Affirm Mot. at 12, Ex. B.)  The Doeren Mayhew audit, dated February 18, 2002, incorporated these concerns. (Affirm Br. at 12, Ex. B)

        According to Defendants, the results of the 2001 audit alerted the Board to the magnitude of the Scott loans and to the severity of their violations of certain policies, laws, and regulations governing BestSource.[1]  (Affirm Br. at 12.)  Because Plaintiff, in his capacity as President/CEO of BestSource, approved the Scott loans, the Board began to discuss Plaintiff's termination.  (Ex. J; Br. at 5.)   In an action plan that BestSource and Doeren Mayhew developed, the first "high priority" to be addressed was Plaintiff's termination.  (Ex. K)  Although members of the Board sent several emails between each other regarding the Scott loans and Plaintiff's possible termination (Ex. J), none of the emails addressed Plaintiff's possible forfeiture of benefits under the Plan.  (Ex. H, I, J; Br. at 5.)

_____

        [1]Of special note, Plaintiff approved the Scott loans despite the Mortgage Center's reasoned recommendation against such approval. (Br. at 3.)  The Mortgage Center holds only those loans that satisfy Fannie Mae criteria and sends those that do not to BestSource for a determination of whether BestSource would like to hold them.  (Br. at 2; Ex. C at 10-13.)
        The Mortgage Center explained that the Scott loans involved: 1) LTV exceeding Fannie Mae limit; 2) unsatisfactory credit; 3) high ratios; 4) incomplete income-documentation; 5) borrower-supplied appraisals; 5) questionable appraisals; 6) unsatisfactory property conditions; 7) no rental agreements for properties or evidence that properties were generating income; 8) several properties that were purchased on land contract were refinanced for 100% of the "as repaired" value to take cash to make repairs; and 9) no final inspections were conducted to ensure that the repairs were made. (Ex. D; Br. at 3.)  Consequently, the Mortgage Center refused to hold the Scott loans for failure to meet the Fannie Mae criteria and advised BestSource, contrary to common practice, that, "[b]ased on excessive layering of risk factors," it recommended that BestSource not hold the loans. (Ex. C at 10-13; Br. at 2.)

According to BestSource, at a meeting on April 5, 2002, Camille Atkinson ("Atkinson"), Chairperson of the Board, and John Ludwigson ("Ludwigson"), Vice-Chairperson of the Board, advised Plaintiff that the Board was "considering his actions [to be] gross misconduct and had concluded that he was to be terminated as President/CEO of BestSource," and that BestSource "would accept his immediate resignation." (Atkinson Aff. at ¶ 12(d); Pl. Dep. at 90.) Plaintiff tendered his resignation. (Atkinson Aff. at ¶ 12(f).) On April 6, 2002, Atkinson drafted an e-mail to the Board outlining the meeting with Plaintiff. (S.J. Ex. L, Affirm Ex. G) According to that e-mail and Atkinson's affidavit, they discussed Plaintiff's entitlement to Plan benefits only after Plaintiff inquired about it. (Atkinson Aff. at ¶ 12(e); S.J. Ex. L.)

Plaintiff's version of this meeting is quite different. According to Plaintiff, during the April 5, 2002, meeting, Plaintiff was informed that BestSource had decided to terminate his employment. (Pl. Aff. at ¶ 3; Pl. Dep. at 5-7.) Plaintiff was given the option of resigning "to avoid a termination for cause."[2] (*Id.*; 8/2/04 Resp.) Plaintiff maintains that, before he agreed to resign, he inquired into whether such a resignation would negatively affect his entitlement to Plan benefits, and he was advised that it would not. (Pl. Aff. at ¶ 4; Pl. Dep. at 83-84.) Plaintiff

---

[2]The parties dispute the nature of the April 5, 2002, discussion regarding Plaintiff's entitlement to Plan benefits. Specifically, Plaintiff argues, in essence, that Atkinson and Ludwigson promised him that he would still be entitled to those benefits while Atkinson and Ludwigson deny making any such promise.

This dispute, however, is immaterial here. Although "equitable estoppel may be a viable theory in ERISA cases, . . . [a] party cannot seek to estop the application of an unambiguous written provision in an ERISA plan" because, in so doing, he would necessarily be arguing that "he reasonably and justifiably relied on a representation that was inconsistent with the clear terms of the plan." *Marks v. NewCourt Credit Group, Inc.,* 342 F.3d 444 (6th Cir. 2003) (reasoning that, in permitting such estoppel, one would be enforcing something other than the Plan itself). Rather, the issue is whether, under the unambiguous terms of the Plan and regardless of any promises otherwise, Plaintiff, in fact, forfeited his benefits. (*See* Plan at § 5.4(a)-(b).)

5

claims that this alleged assurance "induced . . . [him] to choose the option to resign." (*Id.*) The reality was that Plaintiff was choosing whether to resign or to be terminated. At the time of his resignation in lieu of termination, Plaintiff was fifty-six years old. (Br. at 6.) Plaintiff's future claim to benefits under the Plan, if he had not been terminated/resigned, were "somewhere in excess of $200,000." (8/2/04 Resp. at 5.)

Approximately one year after Plaintiff's resignation, Plaintiff made a formal request for Plan benefits. (S.J. Br. at 6, Affirm Br. at 16; Affirm Resp. at 4.) In an April 29, 2003, letter to Plaintiff, Atkinson informed Plaintiff that he would not receive any benefits under the Plan on the grounds that, as a result of Plaintiff's resignation from employment, "there has been no vesting of any benefits under the terms of the . . . Plan" and "all . . . rights and interests under the . . . Plan have been forfeit[ed]." (Pl.'s Ex. H; Affirm Ex. 4.)

The Plan provides "the right to appeal a denied claim to the Plan Administrator," and that the "Plan Administrator shall afford a full and fair review of the claim and its denial." (Plan § 7.04 at 9.) On July 31, 2003, Plaintiff appealed this decision on the ground, among others, that his resignation was involuntary and that his termination was without cause.[3] (Pl.'s Ex. L; Affirm Ex. H; Affirm Resp. at 6.)

Via a letter dated August 26, 2003, Atkinson advised Plaintiff that he was granted a

---

[3]In his appeal, Plaintiff argued that he had not committed acts of willful malfeasance or gross negligence for the following reasons: 1) BestSource's independent auditors had no concerns with the Scott loans when they previously reviewed them; 2) Scott had an excellent history with BestSource; 3) Scott was willing to "commit additional collateral to secure the loans to the point that the value of the collateral would exceed the amount of the loans by a substantial amount"; 4) John Normandeau, an officer of BestSource, "was directly responsible for monitoring a single borrower's status in relation to the single borrower limit," and failed to provide Plaintiff "with information that would have called to . . . [his] attention that . . . [Scott] had reached that maximum limit." (Pl.'s Ex. H, Affirm Resp. at 6.)

review of the Plan Administrator's benefits' denial, and set forth the process by which the review would proceed. (Pl.'s Ex. I; Affirm Resp. at 7.) Atkinson noted, however, that the Board believes that, even if Plaintiff had not voluntarily resigned his employment, his approval of the Scott loans constituted willful malfeasance and gross negligence. (*Id.*)

On September 25, 2003, Plaintiff submitted his formal appeal to the Board. (Pl. Ex. J; Affirm Resp. at 7.) Along with raising some of the same issues asserted previously, Plaintiff argued that the Board had a financial motive to "blame the entire . . . Scott loan problem" on Plaintiff so as to make a bond claim to secure an insurance settlement for potential losses arising from those loans. (Affirm Resp. at 8.) Plaintiff cited Atkinson's and Ludwigson's admissions on April 6, 2002, that Scott was a long-time member of BestSource, had an established track record of servicing his debt, and was not in default on any of his loans, and that the Board had to terminate Plaintiff's employment to avoid the risk of appearing irresponsible. (*Id.*) Plaintiff also challenged certain of the Scott loans' alleged violations of governing policies and regulations in the first instance[4] and Plaintiff's responsibility for certain of those violations.[5]

Via letter dated November 7, 2003, Atkinson advised Plaintiff that his appeal of the Plan

---

[4]For example, Plaintiff argued that Scott was, in fact, required to verify his income to BestSource annually for all outstanding loans. (Pl.'s Affirm. Ex. J)

[5]Specifically, Plaintiff maintained that most of the Scott loans were on BestSource's books for years and had passed the scrutiny of auditors. (Affirm Resp. at 9; Pl. Ex. J) Plaintiff argued that the Scott loans did not originate in October through December of 2001, but were simply refinances to a lower rate. (*Id.*) Plaintiff asserted that John Normandeau, an officer of BestSource, notified Plaintiff that Scott was nearing the single-borrower maximum in August of 2001, but that, with BestSource's sale of a credit-card portfolio in September of 2001, its assets and maximum limit increased. (*Id.*) Plaintiff further asserted that, when he was approving the refinance loans for Scott during October through December of 2001, Normandeau never advised Plaintiff that Scott's loan portfolio exceeded the maximum limit. (*Id.*) Plaintiff noted that BestSource had prior favorable experiences with the appraisers of the Scott loans. (*Id.*)

Administrator's benefits' denial was denied. (Pl. Affirm Ex. K, S.J. Ex. M; Defs.' Affirm Ex. I.) As one of several reasons for Plaintiff's just-cause termination, Atkinson advised Plaintiff that his approval of the Scott loans constituted "gross misconduct." (*Id.*)

In an effort to secure insurance coverage for potential losses arising from the Scott loans, BestSource filed a bond claim with its bonding company.  (S.J. Br. at 17; Ex. N; Affirm Resp. at 5.)  The bond claim alleges that Plaintiff's handling of the Scott loans constituted a "lack of faithful performance," and that the existence of a loss from those loans was then "undetermined."  BestSource received a significant sum from its bond claim.  Following that bond claim, the bonding company refused to bond Plaintiff at his subsequent place of employment, the Motor City Co-op Credit Union ("Motor City").  (Br. at 17.)  Consequently, Motor City terminated Plaintiff.

## II. PROCEDURAL HISTORY

On March 18, 2004, Plaintiff instituted this action against Defendants BestSource and the Plan (collectively, "Defendants").  Count I alleges that, should the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., not govern the Plan, Defendants breached that Plan in violation of Michigan law.  (Compl. at ¶¶ 62-70.)  Count II alleges that Defendants wrongfully denied Plaintiff's benefits under the Plan in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B).  (*Id.* at ¶¶ 71-82.)  Count III alleges that Defendants discharged Plaintiff for the purpose of wrongfully interfering with Plaintiff's attainment of his benefits under the Plan in violation of § 510 of ERISA, 29 U.S.C. § 1140.  (*Id.* at ¶¶ 83-88.)  Count IV alleges that BestSource tortiously interfered with Plaintiff's subsequent employment relationship with Motor City Credit Union ("Motor City") in violation of Michigan law.

8

On April 26, 2004, BestSource filed a Counterclaim against Plaintiff.  Count I alleges that Plaintiff, while BestSource's President/CEO, was negligent in "authorizing and approving" the Scott loans contrary to by-laws, loan policies, and regulations applicable to BestSource. (Countercl. at ¶¶ 23-27.)  Count II alleges that Plaintiff's approval of the Scott loans constituted gross negligence in violation of Michigan law.  (*Id.* at 28-33.)  Count III alleges that Plaintiff, as President/CEO, breached his fiduciary duties to BestSource in approving the Scott loans.  (*Id.* at 34-43.)  Count IV alleges that Plaintiff, as BestSource's agent, breached his fiduciary duties to BestSource in approving the Scott loans.  (*Id.* at 44-48.)

On June 30, 2004, the Plan filed a motion for summary judgment on all of Plaintiff's claims, to which BestSource later filed a concurrence.  On February 7, 2005, the Court issued an Opinion and Order Denying, Without Prejudice, Defendants' Motion for Summary Judgment. As to Counts I through III, the Court reasoned that Defendants' motion was premature because discovery had not yet concluded.  The Court underscored that Count IV was only asserted against BestSource such that the Court need not grant the Plan summary judgment on this claim.

On March 18, 2005, Defendants filed the instant joint motions to affirm and for summary judgment.  The motion to affirm solely addresses Count II of Plaintiff's complaint while the summary-judgment motion addresses all of the remaining counts of Plaintiff's complaint.

## II.  ANALYSIS

### A.  Subject-Matter Jurisdiction

The Court must assure itself that ERISA governs the Plan so as to afford the Court the requisite subject-matter jurisdiction.          Defendants contend that the Plan is a "top hat" plan under ERISA.  (Affirm Br. at 2.)  "Top hat" plans are ERISA plans that are "unfunded" and that

9

an employer maintains chiefly "for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1); *Wolcott v. Nationwide Mutual Ins. Co.,* 884 F.2d 245, 252 (6th Cir. 1989). Top hat plans are exempt from ERISA's substantive provisions, such as those regarding participation, vesting, funding, and fiduciary responsibilities, and are subject solely to ERISA's enforcement provisions, such as those concerning reporting, disclosure, administration, and enforcement. *Garratt v. Knowles,* 245 F.3d 941, 946 (3d Cir. 2001); *Demery v. Extebank Deferred Compensation Plan (B),* 216 F.3d 283, 286-87 (2d Cir. 2000). ERISA governs suits to recover benefits owed under a top hat plan. *See Garratt,* 245 F.3d at 946.

According to Defendants, the Plan is an unfunded, non-qualified deferred-compensation plan for a select group of management or highly-compensated employees–Plaintiff. (S.J. Br. at 17; S.J. Reply at 1; Affirm Br. at 5.) As to the Plan being unfunded, Defendants underscore that, although the Plan has a "rabbi trust"[6] that creates a source of funding, such a trust does not render the Plan funded because: 1) the trust assets constitute BestSource's general assets since, until the trust assets are paid to plan participants/beneficiaries, they remain BestSource's property, are subject to the claims of BestSource's creditors, and are not taxable to the beneficiaries (Plan § 7.02; Trust Agreement, Def.'s Ex. 1);[7] and 2) the Trust Agreement provides that the trust

---

[6]A "rabbi trust" is a "grantor trust . . . in which an employer makes contributions to the trust in the name of beneficiaries to create a source of funding for otherwise unfunded benefit plans," "the trust corpus technically remains [the] property of the employer" such that trust beneficiaries are not taxed on contributions until they are distributed, and trust assets, in exchange for the tax benefit, remain "subject to the claims of the grantor's general creditors." *In re Outboard Marine Corp.,* 278 B.R. 778, 785 (N.D. Ill. 2002).

[7]*See Demery,* 216 F.3d at 287; *Blesky v. First Nat'l Life Ins. Co.,* 818 F.2d 661 (8th Cir.); *Miller v. Heller,* 915 F. Supp. 651 (S.D.N.Y. 1996).

constitutes an unfunded arrangement and does not affect the unfunded status of the plan under ERISA (Trust Agreement, Ex. 1).  *See Miller v. Heller,* 915 F. Supp. 651, 659 (S.D.N.Y. 1996) (holding that plans in which the employer has created a "rabbi trust" to pay its underlying obligations are unfunded under ERISA).

Plaintiff cursorily contends that the Plan, even as a purported "top-hat" deferred-compensation plan, does not constitute an ERISA plan because its administrative scheme is deficient.[8]  (S.J. Resp. at 2.)  "The hallmark of an ERISA benefit plan is that it requires an ongoing administrative program to meet the employer's obligation."  *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11-12 (1987). An administrative scheme consists of more than the process by which the company decides to offer benefits in the first instance.  *Nelson v. General Motors Corp.,* 156 F.3d 1231 (6th Cir. 1998).  Plans in which the benefits are predetermined or involve simple or mechanical determinations are not ERISA plans.  *Sherrod v. General Motors Corp.,* 33 F.3d 636, 638-39 (6th Cir. 1994).  A plan may be an ERISA plan if the delivery of its benefits creates an on-going demand on the employer's assets.  *Cassidy v. Akzo Nobel Salt, Inc.,* 308 F.3d 613, 616 (6th Cir. 2002).

According to Plaintiff, the delivery of benefits under the Plan does not create an ongoing demand on employer assets.  (S.J. Resp. at 2.)  Plaintiff underscores that he was the Plan's only participant.  (8/2/04 Resp. at 15.)  Plaintiff argues that, because the annual $20,000 contributions are held and invested in a trust, the payment of such contributions are the only on-going demand on employer assets.  (8/2/04 Resp. at 15.)

As Defendants aptly note, however, Plaintiff provides neither argumentation nor authority

---

[8]Plaintiff contends that, because the Plan does not fall within ERISA, only his breach-of-contract claim survives and should proceed. (S.J. Resp. at 2.)

to support the proposition that ERISA would not govern an otherwise ERISA-qualifying top-hat Plan simply because of the nature of the Plan's administrative scheme.  (Reply at 1.)  Indeed, the case law upon which Plaintiff relies that applies the administrative-scheme test to determine whether an ERISA plan exists do so in the context of ERISA welfare plans, not ERISA pension plans, as here.[9]

In any event, even if the administrative-scheme test were to apply, the Plan would satisfy that test.  Pursuant to the terms of the Plan, its defined contributions are to be transferred into a trust so that BestSource, as trustee, can "administer, invest, and re-invest" those contributions. (Plan at §§ 1.04, 3.01-02, and 7.02; Schedule A to Plan) Thus, the Plan requires financial coordination and control for purposes of the investment and administration of the contributions. The benefits may be paid in a lump-sum payment, installment payments, or in the form of an annuity.  (*Id.* at § 5.02.)  Moreover, the Plan requires the employer to "establish and maintain accounts on behalf of each participant"; to value each account annually, at a minimum; and to give the participant written notice of the account's balance following its valuation.  (*Id.* at § 7.03.) Lastly, the Plan requires the employer, in determining the account balance, to calculate the contributions and any earnings attributable to those contributions and to deduct administrative, investment, and other fees.  (*Id.*)

The Plan falls within ERISA.  Consequently, ERISA preempts Plaintiff's Count I breach-of-contract claim under Michigan law.  (Br. at 17; Reply at 2.)  *See Marks v. NewCourt Credit Group, Inc.,* 342 F.3d 444, 452 (6th Cir. 2003)(recognizing that ERISA preempts "virtually all state law claims relating to an employee benefit plan" unless "their effect on employee benefit

---

[9]While Plaintiff refers to the Plan as a "welfare benefit plan," the Plan is a defined-contribution pension plan.

plans is merely tenuous, remote or peripheral").

## B. Summary-Judgment Motion

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A "genuine" issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In deciding a motion for summary judgment, the Court must draw all justifiable inferences from the evidence in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

## 1. Unlawful-Interference Claim

Section 510 of ERISA, 29 U.S.C. § 1140, renders it unlawful for an employer to terminate an employee "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]" To state a claim of unlawful interference under § 510, the plaintiff must demonstrate that the "employer had a specific intent to violate ERISA." *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997).

Absent direct evidence of such unlawful intent, as here, this Circuit applies the tripartite

*McDonnell-Douglas*[10] framework. *Humphreys v. Bellaire,* 966 F.2d 1037, 1043 (6th Cir. 1992).

First, the plaintiff must establish a *prima facie* case of unlawful interference under § 510. *Id.* To

establish such a *prima facie* case here, the plaintiff must prove by a preponderance of the

evidence that: 1) the employer terminated him 2) "for the purpose of interfering 3) with the

attainment of any right to which . . . [he] may become entitled." *Id.* The plaintiff must show that

the employer's desire to interfere with his entitlement to future benefits was a "motivating factor"

in his termination. *Id.* (holding that the requisite causation need not be sole).

Once the plaintiff establishes a *prima facie* case of unlawful interference under § 510, a

presumption of such unlawful interference arises, and the burden of production shifts to the

defendant to articulate a legitimate reason for the plaintiff's discharge. *Smith,* 129 F.3d at 865. If

the defendant meets this burden, then the presumption of unlawful retaliation disappears, and the

plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was

a mere pretext for unlawful retaliation by establishing that the proffered reason: 1) has no basis in

fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse

action. *Id.*; *see Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994). If

the plaintiff demonstrates that the defendant's proffered, legitimate reason is a pretext for

unlawful interference under § 510, then the fact finder *may* infer such unlawful interference. *See*

*Kline v. Tenn. Valley Auth.,* 128 F.3d 337, 344 (6th Cir. 1998). Throughout the entire

*McDonnell-Douglas* framework, the plaintiff bears the burden of persuasion. *St. Mary's Honor*

*Ctr. v. Hicks,* 509 U.S. 502, 511 (1993).

Defendants assert that Plaintiff, as a matter of law, has failed to demonstrate a *prima facie*

---

[10]*McDonnell Douglas v. Green,* 411 U.S. 792 (1973).

case of unlawful interference under § 510. Specifically, Defendants maintain that Plaintiff, as a matter of law, cannot establish that Defendants terminated him "for purposes of interfering" with Plaintiff's future attainment of Plan benefits. (Br. at 10.) As evidence showing that BestSource terminated him in violation of § 510, Plaintiff testified that he had resigned based upon BestSource's assurance that they would pay his benefits and that BestSource had refused to pay those benefits a year later. (Pl. Dep. at 93; Br. at 10.) However, Plaintiff concedes that Defendants permitted Plaintiff to resign in lieu of termination for his handling of the Scott loans such that, even absent Plaintiff's resignation, Plaintiff would have been terminated. (Pl. Aff. at ¶ 3; Pl. Dep. at 5-7; 8/2/04 Resp.)

Plaintiff further testified that Plante Moran's certified audit in 2003 for the year 2002, which recognized that BestSource had eliminated their liability under the Plan, demonstrated that BestSource had already made its decision to terminate Plaintiff. (Pl. Dep. at 93; Br. at 11.) As Defendants aptly note, however, the audit's recognition that BestSource was no longer liable to pay Plan benefits to Plaintiff following his constructive termination does not prove that BestSource terminated Plaintiff to avoid paying him those benefits in the first instance. (Br. at 11.) Defendants further note that the audit, which was prepared eight months after Plaintiff's termination, has no bearing on the Board's state of mind in terminating Plaintiff. (*Id.*)

In his August 2, 2004, response, upon which he relies, Plaintiff argued that genuine issues of material fact exist as to whether Defendants terminated him, "at least in part, for the purpose of interfering with" Plaintiff's attainment of Plan benefits. (8/2/04 Resp. at 19.) Specifically, Plaintiff argued that "[i]t sure looks from Ms. Atkinson's email of April 6, 2002, . . . that she and everyone else on the Board . . . was conscious of the deferred compensation benefits that were

15

due to Plaintiff upon separation from employment . . . . " (*Id.* at 19.)  However, that very e-mail makes clear that Plaintiff's entitlement to Plan benefits was discussed only after he had been advised that he would be terminated for gross misconduct and only after Plaintiff had inquired into that entitlement. (S.J. Ex. L.)

Plaintiff maintains that a reasonable jury could conclude that Atkinson and her "cohorts on the Board intended to take that money away from Plaintiff, and then huddled for some 13 months developing a nonsensical explanation for denying the benefits."  (8/2/04 Resp. at 19) However, such speculation, absent any substantiating evidence, is insufficient to raise a genuine issue of material fact that Defendants terminated Plaintiff to interfere with his entitlement to benefits.  Of special note, at the time of his resignation in lieu of termination, Plaintiff was fifty-six years old such that his benefits under the Plan would not have vested until approximately six years later.  (Br. at 6.)  Plaintiff's benefits under the Plan were "somewhere in excess of $200,000."  (8/2/04 Resp. at 5.)  Thus, there is no evidence showing that Plaintiff's discharge occurred in close proximity to his vesting of Plan benefits or that the sheer amount of those benefits would have motivated Defendants to interfere with Plaintiff's attainment of them absent his conduct.

Even drawing all reasonable inferences from the evidence in Plaintiff's favor, no reasonable jury could conclude that Defendants terminated Plaintiff to avoid paying Plaintiff his benefits under the Plan.   Plaintiff, as a matter of law, has failed to establish a *prima facie* case of unlawful interference under § 510.

### 2.  Tortious-Interference Claim

To state a claim of tortious interference with a business relationship under Michigan law,

16

a plaintiff must allege: 1) the existence of a business relationship with a third party; 2) the

defendant's knowledge of the plaintiff's existing business relationship; 3) that the defendant's

intentional and improper interference with that existing relationship induced or caused a breach,

disruption, or termination of that relationship; and 4) that such interference injured the plaintiff.

*Mich. Podiatric Med. Ass'n v. Nat'l Foot Care Program, Inc.,* 175 Mich. App. 723, 735 (1989).

The plaintiff must also allege that the defendant committed either a "per se wrongful act" or a

"lawful act with malice and unjustified in law," and that such an act was to "invad[e] the

contractual rights or business relationship" of the plaintiff.  *Wood v. Herndon & Herndon*

*Investigations, Inc.,* 186 Mich. App. 495, 499-500 (1990).  Where the defendant's challenged act

is not *per se* wrongful, the plaintiff must show "specific affirmative acts that corroborate the

unlawful purpose of the interference."  *CMI Int'l Inc. v. Intermet Int'l Corp.,* 251 Mich. App. 125,

131 (2002).

Defendants maintain that Plaintiff's tortious-interference claim fails as a matter of law.

(Br. at 17.)  Correctly arguing that their filing of the bond claim was not wrongful *per se*,

Defendants contend that Plaintiff, as a matter of law, has failed to show the requisite "specific

affirmative acts" demonstrating that Defendants filed that claim for the unlawful purpose of

interfering with Plaintiff's employment at Motor City.  *See CMI Int'l Inc.* 251 Mich. App. at 131.

According to Defendants, they filed a claim with their bonding company because they anticipated

significant losses from the Scott loans, not because they maliciously sought to interfere with

Plaintiff's employment, as Plaintiff cursorily contends.  (Br. at 17; Ex. N).  Indeed, Defendants

note that they recovered a significant amount on that bond claim.

Plaintiff has not responded to Defendants' assertion that they are entitled to summary-

judgment on Plaintiff's tortious-interference claim.[11]  As to what evidence Plaintiff had to substantiate that claim, Plaintiff testified that he had a "feeling" of a "lot of animosity coming from Bestsource."  (Pl. Dep. at 103-04.)  However, such speculative testimony is insufficient to create a genuine issue of material fact regarding Defendants' allegedly-unlawful motive in filing the bond claim.

Plaintiff further testified that BestSource could have filed the bond claim without using the wording that they did, and that such wording forced the bonding company's hand in revoking Plaintiff's bond. (*Id.*)  Yet, to recover for any losses arising from the Scott loans, the bond-claim form required Defendants, as to the "type of claim being filed," to select either an employee's dishonesty or an employee's lack of faithful performance as the reason for the loss.  (S.J. Ex. L)  Moreover, the exhibit to the bond claim simply stated that Plaintiff, acting as President/CEO, approved the Scott loans in "conscious disregard" of governing policies and regulations.  Based upon the actual facts and circumstances, as discussed below, such language does not suggest that Defendants' motive in filing the bond claim was malicious or unlawful.  Because Plaintiff has failed, as a matter of law, to demonstrate that Defendants' motive in filing the bond claim was to interfere with Plaintiff's subsequent employment, Plaintiff's tortious-interference claim necessarily fails.

## B.  Motion to Affirm

Also before the Court is Defendants' joint motion for a judgment affirming the Plan Administrator's denial of Plaintiff's benefits, to which Count II of Plaintiff's complaint pertains. While the Court's scheduling order requires the parties in an ERISA action to file cross-motions

---

[11]Rather, Plaintiff simply contends that the Plan is not an ERISA plan (S.J. Resp. at 1.), or that ERISA does not preempt such a claim (8/2/04 Resp. at 19.).

regarding the denial of plan benefits, Plaintiff did not file such a cross-motion.  However, in his

response to Defendants' motion to affirm, Plaintiff requests the Court's entry of judgment in his

favor.

### 1.  Relevant Inquiry

While a traditional motion for summary judgment requires a court to look beyond the

pleadings to determine whether a genuine issue of material fact exists so as to warrant trial, a

court, in adjudicating a wrongful-denial-of-benefits claim under ERISA, must confine its review

to the record that existed before the plan administrator when it rendered the challenged decision.

*Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 615 (6th Cir. 1998).  As an exception to

this general prohibition, a court may consider "evidence [that] is necessary to resolve an ERISA

claimant's procedural challenge to the administrator's decision, such as an alleged lack of due

process afforded by the administrator or alleged bias on its part."  *Id.*

Generally, the Court does not employ the traditional summary-judgment standard to

determine whether to uphold a decision that an ERISA plan administrator rendered.  *See, e.g.,*

*Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613-15, 619 (6th Cir. 1998).  Absent an

ERISA plan's express grant of discretionary authority to its administrator to determine eligibility

for benefits or to construe the terms of the plan, a court usually conducts a *de novo* review of a

plan administrator's benefits' denial.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

115 (1989); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710-11 (6th Cir. 2000).  A *de novo* review

requires the court to take a "fresh look" at the pertinent record.  *Wilkins,* 150 F.3d at 616.

Conversely, when an ERISA benefit plan expressly grants its administrator such

discretionary authority, a court usually reviews the administrator's determination under the

19

arbitrary and capricious standard. *See Firestone,* 489 U.S. at 111-15; *Williams,* 227 F.3d at 710-11. Pursuant to this highly-deferential standard, the Court may overturn the administrator's benefits' denial if it was irrational, an abuse of discretion, inconsistent with the Plan's terms, *Eriksen v. Metro. Life Ins. Co.,* 39 F.Supp.2d 864, 869 (E.D. Mich. 1999), or made in bad faith, *Racknor v. First Allmerica Fin. Life Ins. Co.,* 71 F.Supp.2d 723, 729 (E.D. Mich. 1999). A benefits' denial is not arbitrary and capricious "when it is possible to offer a reasonable explanation, based on the evidence, for a particular outcome." *Davis v. Kentucky Fin. Co. Ret. Plan,* 887 F.2d 689, 693 (6th Cir. 1989).

In the instant case, the parties agree that the Plan delegates discretionary authority to the Plan Administrator to determine eligibility for benefits. (*See* Plan at § 7.01.) Thus, the arbitrary-and-capricious standard of review applies to the Court's review of the benefits' denial. However, because BestSource is the employer as well as the sponsor and administrator of the Plan and, thus, is operating under an inherent conflict of interest, the Court must weigh that conflict of interest as a "facto[r] in determining whether there is an abuse of discretion." *See Firestone,* 489 U.S. at 115; *Marks,* 342 F.3d at 457 (holding that, where the arbitrary-and-capricious standard applies to the review of a plan administrator's benefits' denial, the court should consider, under that standard, the administrator's conflict of interest as sponsor and administrator of the ERISA plan).

Defendants, on April 22, 2005, filed a joint motion to strike evidence that Plaintiff attached to his response to Defendants' motion to affirm that is beyond the administrative record. Plaintiff, in response, contends that his proffered evidence either falls within the administrative record in the first instance or bears upon Plaintiff's procedural challenges to the Plan administrator's benefits' denial on grounds of bias and lack of due process. However, even if the

Court were to consider Plaintiff's proffered evidence, such evidence would not require the reversal of the Plan administrator's denial of Plaintiff's benefits.  Put another way, even if the Court were to deny Defendants' motion to strike in its entirety, Defendants would still be entitled to a judgment affirming that benefits' denial.  Thus, an adjudication of the instant motion to affirm does not require an adjudication of Defendants' motion to strike.

### 2. Review of Benefits' Denial

Because the parties agree that Plaintiff would have been terminated even if he had not resigned, the relevant inquiry is whether the Board, as Plan administrator and decision-maker in Plaintiff's constructive termination, acted in an arbitrary and capricious manner in determining that Plaintiff, in handling the Scott loans, committed "acts of wilful malfeasance or gross negligence in a matter of material importance to" BestSource so as to forfeit his Plan benefits. .*Id.* at § 5.4(a)-(b).)

According to Defendants, the Plan administrator's determination, final on November 7, 2003, that Plaintiff had forfeited his benefits under the Plan was "fair, rational, and consistent with the terms of the Plan."  (Affirm Br. at 11.)  According to Defendants, Plaintiff forfeited his benefits for having approved, between November of 1999 and February of 2002, approximately 28 loans totaling over $3 million to Scott in violation of certain policies, by-laws, and regulations governing BestSource.  (*Id.* at 12.)  BestSource maintains that the 2001 Doeren Mayhew audit, dated February 18, 2002, alerted the Board to the magnitude of the Scott loans and to the severity of their violations. (*Id.* at 11.)  Defendants underscore that the Scott loans were of material importance to BestSource because their violations of governing policies and regulations jeopardized BestSource's financial stability.  (*Id.* at 16-17.)

Plaintiff, in response, maintains that the Plan administrator's benefits' denial was not "independent, deliberate, . . . [or] rational."  (Resp. at 2.)  Plaintiff notes that BestSource was making $200,000 off of the Scott loans per year; that all of Scott's debt was with BestSource; and that Scott, a 20-year member of BestSource, had been doing those kinds of loans for years, was making monthly payments of $30,000, and had a good payment history. (Atkinson 3/20/02 e-mail)

Plaintiff underscores BestSource's inherent conflicts of interest arising from its simultaneous roles as employer, Plan sponsor, and Plan administrator.  (Resp. at 2-3.)  Yet, as Defendants aptly note, the mere existence of such conflicts of interest do not automatically render BestSource's benefits' denial as Plan administrator arbitrary and capricious, and Plaintiff has failed to proffer any "significant evidence"that BestSource's interests as employer or Plan sponsor actually motivated that benefits' denial.  *See Peruzzi v. Summa Med. Plan,* 137 F.3d 431, 433 (6th Cir. 1998) (requiring, for purposes of finding an actual conflict of interest under the arbitrary-and-capricious standard, "significant evidence" that a plan administrator's interests as plan sponsor actually motivated the benefits' denial).

### a.  Alleged Violations

As to the Scott loans' alleged violations of policies, by-laws, and regulations governing BestSource, Defendants point to the following violations. First, Defendants underscore that Plaintiff permitted Scott to hire his own appraiser for several of the loans contrary to NCUA Part 722, with defines an appraisal as a written statement "independently and impartially prepared by a qualified appraiser."  (Affirm Br. at 13, Ex. D & E.)  Plaintiff maintains that his approval of the Scott loans from September through December of 2001 based upon Scott-hired appraisals did not

violate BestSource's December 19, 2000, loan policy, the policy in effect at that time; rather, according to Plaintiff, BestSource's August 29, 2002, loan policy was the first policy to require an "independent appraisal on all real estate loans."[12]  (Affirm Resp. at 18; S.J. Resp. at 13; 8/2/04 S.J. Resp. at 13-14.)  Yet, to the extent that Plaintiff suggests that allowing Scott to provide his own appraiser for 28 pieces of real estate was permissible simply because the loan policy, in effect at that time, may not have expressly required an independent appraisal, Defendants aptly note that such a lending practice was, nevertheless, unsafe and contrary to BestSource's best interests. (Affirm Reply at 4-5.)

According to Plaintiff, he testified that, although some of the appraisals were contingent upon Scott making improvements on the properties with the cash that he received from the mortgage or refinance, Plaintiff knew from personal inspections that Scott had a track record of making the promised improvements.  (Affirm Mot. at 19; Pl. Dep. at 27-28.)  However, Plaintiff actually testified that he was "pretty confident" that Scott was making the promised improvements because Plaintiff had visually inspected a Scott property "in the early 90's."  (Pl. Dep. at 27-28.)

Second, Defendants underscore that several of the Scott loans were in excess of 100% of the appraised valuation of the real estate ("LTV")–with some reaching 178% of the LTV–in violation of Article XII of the By-laws.  (Affirm Br. at 13, Ex. E.)  Plaintiff, in turn, maintains that each of the Scott loans was within 100% of the original appraised values of the real estate. (8/2/04 S.J. Resp. at 13, Pl. Aff. Ex. D)  Plaintiff argues that Defendants, in concluding otherwise,

---

[12]Plaintiff testified that the Scott-hired appraiser was certified, and that his appraisal reports were reviewed for rationality and questioned, if necessary.  (Affirm Mot. at 18-19; Pl. Dep. at 20-25.)

are relying upon post-hoc appraisals that they ordered.  (8/2/04 S.J. Resp. at 14.)  Yet, Defendants

ordered such appraisals because the original appraisals were unsound since Scott selected the

appraiser.

Third, Defendants contend that almost all of the 28 Scott loans were business loans,[13] and

that Plaintiff approved those loans during a time when BestSource had no separate business-loan

policy in effect contrary to NCUA Part 723.[14]  (Affirm Br. at 14, Ex. F.)  Defendants further note

that Plaintiff failed to designate the business loans as such.  (Affirm Br. at 13.)  Indeed, Plaintiff

admits that, up until BestSource's August 29, 2002, loan policy, which expressly provided that

BestSource "will not offer member business loans," there was no BestSource loan policy

addressing or prohibiting member business loans until the August 29, 2002, policy.  (8/2/04 S.J.

Resp. at 11.)

Fourth, Defendants argue that, during the time that Plaintiff approved the Scott loans,

BestSource always had a policy that any real estate serving as collateral for loans was to be owner

occupied, and that, although the 28 Scott loans had real estate as collateral, Scott clearly did not

occupy all of those properties. (Affirm Br. at 14.)  As Plaintiff points out, all of BestSource's loan

policies permitted mortgage loans when "[t]he home is an owner-occupied, up to four family

dwelling, condominiums, rental property or a vacation home."  (8/2/04 S.J. Resp. at 11.) Despite

---

[13]NCUA Part 723 defines a member business loan as a loan whose proceeds the borrower uses for commercial, corporate, business investment, or agricultural purposes.  (Ex. Q; Br. at 14.) Defendants assert that BestSource determined that, with the exception of one mortgage loan for Scott's residence, Scott was purchasing real estate as investment property and renting homes to various individuals.  (Ex. Q; Br. at 15.)

[14]According to Defendants, although BestSource had a business-loan policy in effect from March of 1999 to March of 2000, during which time two of the twenty-eight Scott loans were approved, the policy was for a specific loan to a specific member other than Scott.  (Affirm Br. at 14, Ex. 2.)

the real-estate provisions' express reference to "owner-occupied," Plaintiff argues that both he and Pam Cady, a former BestSource employee, reasonably believed that the provisions permitted mortgages on non-owner-occupied rental properties.  (Cady Dep. at 30; Affirm Resp. at 18.)

Lastly, Defendants argue that the concentration of Scott loans in December of 2001 exceeded 20% of BestSource's net worth–by $1.2 million–in violation of Article XII, which limits loans to one member to 20% of BestSource's net worth for the most recent calendar quarter.  (Affirm Br. at 13, Ex. B & D)  Defendants further argue that the Scott business loans exceeded 15% of BestSource's net worth–by $646,000–in violation of NCUA Part 723, which prohibits aggregate business loans to any one member from exceeding 15% of that net worth. (Affirm Br. at 15, Ex. B, 2)

Plaintiff asserts that John Normandeau ("Normandeau"), BestSource's then Chief Operating Officer or Chief Financial Officer, was responsible for tracking whether a borrower was nearing the maximum loan amount.  (Resp. at 15.)  Plaintiff testified that, in early 2001, Normandeau notified Plaintiff that Scott was above the maximum limit, and Plaintiff stopped approving loans for Scott.  (Pl. Dep. at 35-36.)  Plaintiff further testified that, with BestSource's sale of a credit-card portfolio, its assets and maximum limit increased such that Plaintiff resumed lending to Scott.  (Pl. Dep. at 35-36, 39; Affirm Resp. at 15.)  According to Plaintiff, he believed that Normandeau was tracking Scott's loan portfolio to ensure that Scott did not exceed the maximum limit, and that Normandeau would notify Plaintiff if the problem recurred.  (Pl. Dep. at 37-38.)

Defendants challenge as preposterous Plaintiff's assertion that, even though he was CEO and the only individual who approved the Scott loans, it was permissible for Plaintiff to keep

25

approving loans to Scott, regardless of the amount of such loans or the risk that they posed to BestSource, until Normandeau or someone else notified Plaintiff not to do so. (Affirm Reply at 4 n.3.) In any event, Defendants maintain that, even if Plaintiff were somehow relieved of responsibility for the Scott loans exceeding the maximum percentage of BestSource's net worth based upon Normeandeau's alleged responsibility for tracking and advising Plaintiff of that status, Plaintiff would still be responsible for the Scott loans' many other violations of governing policies, by-laws, and regulations.[15] (*Id.*)

The thrust of Plaintiff's proffered evidence is that Board tagged Plaintiff "with the full blame" for the "seriously problematic" Scott loan portfolio while intentionally failing to investigate or ignoring the fact that other individuals "shared part of the blame."[16] (Affirm Resp. at 19.) Indeed, Plaintiff expressly argues that, because other individuals shared the blame for the Scott loans, he did not commit "wilful malfeasance" or "gross negligence." (Resp. at 3.) As

---

[15]Specifically, Defendants point to such violations as: 1) the existence of over 25 loans to one member; 2) the absence of verification of Scott's income; 3) Scott's unsatisfactory credit history; 4) the absence of rental agreements evidencing that the properties were generating income; 5) the properties being financed for 100% of their repair value without any follow-up to determine if Scott made the promised repairs; 6) the interest rates not reflecting the loans as business loans or the high risk of the loans; and 7) the significant loss to BestSource arising from the Scott loans. (Affirm Reply at 4.)

[16]In particular, Plaintiff contends that: 1) BestSource's Audit Committee, of which Ludwigson was the Chairman and which included a Doeren Mayhew representative, knew of the nature and quantity of the Scott loans for at least two years before Plaintiff was terminated for them (Resp. at 2.); 2) Normandeau "had dropped the ball in his undertaking to monitor and track" the Scott loan portfolio and "was every bit as much to blame as Plaintiff was for the problem that led to Plaintiff's termination"(Resp. at 3.); 3) Other BestSource loan officers, including Normandeau, looked at the Scott-hired appraisals (Affirm Mot. at 19; Pl. Dep. at 24-25.); 4) on several occasions, Cady discussed the fact that Scott had numerous mortgages on rental properties with Ludwigson; other members of the Audit Committee; and Joe Zito, a CPA with Doeren Mayhew (Cady Dep. at 31-32; Affirm Resp. at 17-18.); and 5) Doeren Mayhew and state examiners knew that BestSource was carrying loan balances in excess of the levels that BestSource's by-laws permitted (Affirm Mot. at 17; Cady Dep. at 35-41.).

26

Defendants persuasively contend, however, the issues of fact regarding whether other individuals shared some responsibility for the problems with the Scott loan portfolio are not material to whether, under the plain and unambiguous language of the Plan, *Plaintiff's* actions in approving those loans supported his resignation/termination, which resulted in the forfeiture of his Plan benefits.  (Affirm Reply at 3.)  Defendants maintain that the Plan administrator determined that Plaintiff's approval of the Scott loans constituted "willful malfeasance" and "gross negligence" because Plaintiff was the CEO of BestSource, the primary individual who met with Scott when he sought a loan, and was a former auditor of credit unions for legal and regulatory violations. (Affirm Br. at 15, Pl. Dep. at 14-17, 30-31, 104-06; Affirm Reply at 3-4 n. 2.)  Plaintiff himself testified that he was responsible for the Scott loans because, as CEO, he was "responsible for what happens on . . . [his] watch."  (Pl. Dep. at 102.)

The Court concludes that the Plan administrator's determination that Plaintiff, in handling the Scott loans, committed "willful malfeasance" and "gross negligence" so as to forfeit his benefits under the Plan was not arbitrary and capricious and, indeed, would survive even a *de novo* review.[17]

## IV.  SUMMARY

For the preceding reasons, the Court:

1)      GRANTS Defendants' joint motion to affirm the Plan administrator's decision to

---

[17]Plaintiff underscores that, as Ludwigson testified, there were no uniform standards in place for what conduct constitutes "willful malfeasance" or "gross negligence" when the Board determined Plaintiff's entitlement to Plan benefits. (Ludwigson Dep. at 60-63.)

However, based upon the plain meaning of those terms, it was not arbitrary and capricious for the Plan Administrator to conclude that Plaintiff's conduct in approving the Scott loans constituted willful malfeasance or gross negligence.  *See Cassidy v. Akzo Nobel Salt, Inc.,* 308 F.3d 613 (6th Cir. 2002) ("Courts should interpret ERISA plan provisions 'according to their plain meaning, in an ordinary and popular sense.").

deny Plaintiff benefits, to which Count II of Plaintiff's complaint pertains; and

2)   GRANTS Defendants' motion for summary judgment on Counts I, III, and IV of Plaintiff's complaint.


SO ORDERED.




                                        s/Paul D. Borman_____
                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

Dated:  August 9, 2005

                          CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 9, 2005.



                                        s/Jonie Parker_____
                                        Case Manager